Mr. Dunn, I just make that point that I assume the jury heard it in that context. Your Honor, let me respond to that point. I don't have the language in front of me, but I remember it. It starts out by reference to two lawyers, and I never can remember the name of the firm, Bozichevich or Borichevich, whatever it is. I remember the name, but I can't pronounce the guy's name. You apparently have read it, and so it may be that you will have that view when I'm through. But when you hear that entire argument, it starts out with words about the firm, and then it starts to generalize, and it says they didn't get an opinion because they were afraid that if they got an opinion, it would be a negative opinion. When they knew, they knew that there were two merchant-in-goo letters saying exactly the opposite of what they were saying. I submit to you, Your Honor, with no deference to your reading of this thing, that the jury is hearing, no, they didn't do it because no lawyer would give them that. That does not mean the Bozichevich firm wouldn't give it. That means no lawyer would give it, and that's our point. Okay, fair enough. Well, in any event, let us talk about the adjacent chip on the software claims. Dr. Gibson never said that the RAM chip, which we're talking about, this adjacent chip, was part of the physical data source. He never said that. What he said, on the contrary, was that five elements on the Broadcom chip, that's the only thing he talked about, were the physical data source. And I commend you to what he said in particular on that subject. And on the blue brief, page 35, it cites Gibson's testimony. Five elements. One of those five elements was not this adjacent RAM chip. And for now, Mr. Waxman, to say that this adjacent chip is part of the physical data source is expert testimony given during this hearing. It is not testimony that was given at the trial. And I suggest it is improper testimony. They refer to our position as equivalent. You must remove it from the physical data source. It was not removed from the physical data source. It was removed by software from this adjacent chip. And there's not a shred of evidence, including footnote 19 on page 52, that it comes back through or to the physical data source. The most that you can extract from that, and this is an ambitious suggestion, is somehow some way that somebody reading that, an expert, and there's no explanation of what all the pages they cite mean, there's software there, there are drawings there, that somehow it goes back to the Broadcom chip. But the Broadcom chip has not only five elements, it's got 10, 15, 20 elements. It doesn't say where it goes back through that chip. Even if it says it goes, even if there were testimony that said that, and I submit it is not testimony, it is attorney argument. Though I have four minutes and 20 seconds, I am cognizant of Judge Klobuchar's comment that he wishes he had as much time as I had. I see in my last four minutes. Thank you. Your Honor, if I could just add one sentence on working in the world. Your Honor, I think that's inappropriate. One sentence. I think we really shouldn't do that. If there is something that you need, that you think is really pressing, that you feel that there's been something that's gone badly amiss, I think you can send a letter to which Mr. Dunner can respond. But I think if we continue in this way, we'll have to have sir, sir rebuttal. It's time for lunch. Well, I was just going to make the point that I have to buy a lunch. I realize this is not a popular request. Very well. Thank you, Your Honor. Thank you, and thank both cases submitted. Why don't we wait for the next case until counsel has had a chance to get out from the front of the courtroom.  Thank you. Take your time. I think it's going to be a few minutes before everybody gets cleared out, and we have to reclaim Judge Pleasure. Thank you. All right, well, Mr. Leavitt, excuse me, let me call the case. Number 06-5128, Fifth Third Bank against the United States. Mr. Leavitt. Good morning, Your Honor. Good morning. The trial court's decision that reduced conversion proceeds are a measure of damage in this case is incorrect for at least five reasons. First, Fifth Third presented absolutely no expert testimony at trial that would indicate that a way to quantify the damage from reduced proceeds is simply to subtract the higher amount that would have been achieved in the before world against the lower amount that was achieved in the actual world. Our experts were unanimous in saying that that is not the way to analyze or quantify damage that may have resulted from the receipt of too few proceeds. Secondly, the logic is inconsistent with all Winstar cases relating to mitigation. These provide that the value of capital is measured by netting the benefits against the cost. The trial judge did no netting. The trial judge said a dollar of extra capital is a dollar in value and didn't net the benefit against the cost. So it's inconsistent with all the mitigation cases in Winstar-related jurisprudence. Thirdly, Fifth Third itself realized in its damage model that was addressed by this court in the prior appeal that a dollar of capital includes the expectation of the investor that he'll receive or she'll receive a return on the capital so that the capital didn't out-cost. Their theory at trial was inconsistent with that model for the reasons I've just suggested. So there's an internal consistency in Fifth Third's position. And the trial judge's ruling, which was to adopt this methodology of subtracting the lower amount from the higher amount, is inconsistent with what Fifth Third itself alleged in its mitigation model that was rejected by the trial court initially and then affirmed on appeal. Fourthly, it's a windfall if this court awards the amount of reduced proceeds because it would be the government that would be providing the proceeds to the thrift and there's no expectation the government is going to receive a return on those proceeds. That's better for the thrift than a dollar provided by an investor where that expectation does exist. And that's out of LaSalle-Taubman and home savings among others where this court's been very explicit that capital is not a free good. It involves an expectation of return by the investor. The fifth point is that it's conceded that the reason the proceeds would have been higher in 93 versus 92 is because the market for conversions had improved. And the market improvement had nothing to do with the breach. There's no allegation that the breach was large enough to affect conversion markets in the thrift industry. And it's clear from Old Stone, which is 450 F Third 360 and Amfed 72 Federal Claims 586 that when there are intervening causes between the breach and the alleged damage, those intervening causes prevent an award of damage based on the breach. It was not foreseeable in 85 and 84 when these contracts were formed that there could be an improvement in the thrift market for conversions in the period between January of 92 when the actual conversion occurred and August of 93 when the alleged Club 4 conversion would have occurred in the absence of a breach. And that failure to prove foreseeability and causation renders the trial justice decision incorrect. Lastly, and this is the sixth reason the trial judge's decision was incorrect, in August of 93 when allegedly in a but-for world there would have been a conversion, the holding company downstreamed a substantial amount of capital to the thrift. In the actual world, the thrift had as much capital, roughly as much capital, as Fifth Third says it would have had in the Club 4 world. And yet, that fact is not recognized in the trial judge's decision. No count is taken of that in excess of $20 million in capital that was downstreamed by the holding company to the thrift in August of 93. Moving to the next point in the appeal, which is the reduced deposit premium proceeds. Again, Fifth Third is arguing, and the trial court accepted the argument, that in a but-for world there would have been higher proceeds from selling these branches located in Cincinnati in 1998 than Fifth Third's predecessor, Citizens, received in 1991 when it actually sold the branches. We're talking about a seven-year period in which the conversion markets improved and the sale markets improved. That improvement had nothing to do with the breach. It's undisputed that in those seven years, multiple things happened that resulted in a better economy for the sale of deposits than had been the case in 91. Therefore, under the same analysis that I provided to you with respect to reduced conversion proceeds, those lesser deposit premiums that were received in the actual world in 91 than would have been received in 98 resulted from exogenous factors wholly apart from the breach, and they occurred seven years later. For that reason, it was incorrect for the trial judge to award, as expectation damages, the difference in deposit premium between what was received in 91 and what would have been received allegedly in a but-for world in 98. I might also mention in this regard that the deposit premium that was received in 91 was a market premium that was twice the average premium that had been received in that year for the sale of deposits generally across the country. Let me ask you a question. Had you completed running down the list of points that you started with? You've gotten up to six in a couple of subpoints. I didn't want to interrupt you after to kind of lay out your case. I have one more point. Okay, why don't you do that, and then I have a question. It's duplication. If you affirm either one of the awards on the reduced conversion proceeds or the reduced deposit premium, there would be duplication. It's inherently illogical that there could be both awards that would reflect the damage because as the undisputed economic testimony at trial indicated, the reason the proceeds would have been higher in their redemptive but-for world would have been that the expectation of the investors would have included the premiums that could have been achieved from the Cincinnati branches. So it's inherently inconsistent and contrary to economic logic that separate awards could be made for reduced proceeds and for a deposit premium. One is subsumed in the other. That ends those points, and I have one argument left relating to the causation issue, which I think maybe I should hold until I answer your question. Well, actually, the question I have may go to causation or at least foreseeability, and that's related, I suppose, in a way to causation. I'm trying to see how far your argument goes with respect to foreseeability. I mean, suppose you have the following case. I have a house. You are my banker. We have a contract, and the contract is to cut me some slack on my mortgage, and we're in a down real estate market, and I plan to sell the house as soon as the value of the house when I purchase it with, let's say, $300,000, and I plan to sell it when at some point the market goes over $400,000. Right now the market is at $250,000, and you breach the contract by insisting on terms of repayment of the mortgage that I can't possibly meet, and so that's a breach which leads to my having to sell the house at $250,000. Now, it was clear that I was going to sell the house when the value of the house reached $400,000, and indeed two years later the value of the house is determined to have reached $400,000. What are my damages in your view in that setting? If you have the numbers in mind. The nature of the contract between the bank and the homeowner in your case. Well, it's clear that the breach of that contract didn't cause the real estate market to go up. Let me give you an example. If you're involved in a futures contract where you're contracting about what a future market's going to be, it's foreseeable to both parties that if it's breached and the future market is not what one of the non-breaching parties thought it would be, the breaching party should have been able to foresee that because that's the essence of the contract. In your case, if the bank and the homeowner are clear that the refinancing is to enable the person to hold the house until the market goes to $450,000, it's arguable that's... Well, nobody said that, but of course it's inherent in any kind of arrangement that you will expect that you will have the advantages of the contract, one of which is that ultimately you may be able to sell the property for a profit. I think if nothing is said about that, then under the Berg case, it's the data that breached that determines the damage. And if intervening factors result in a later loss that have nothing to do... by a certain amount of anchor, as long as... What's at issue is the inability of the homeowner to get equal terms from another banker. That's his damage. If you can prove that, that's his damage. Like, I guess, if someone contracts to sell you a lottery ticket and he doesn't do it and that wins, you're entitled to the difference in the... You're entitled to the amount you paid him for the ticket to be paid back, but not for the jackpot that resulted in the winning of the lottery ticket. I would say this contract had nothing to do with the foreseeability of market events. It's not like a futures contract, which is about that. All this contract was about was being able to count the goodwill as regulatory capital. Yeah, but implicit in that contract is all the kinds of investment-oriented profit-making ideas that the contracting parties have. I mean, this was not merely a contract for how to count capital, was it? I mean, it's not just a little piece off by itself. This is part of a large commercial enterprise, nationwide commercial enterprise, Mr. Leavitt, as we know from the number of times you all have been up here with these cases. Yeah, well, that's true. It was a contract to assist the thrift to comply with regulatory capital requirements. So that they could stay in business and make money. I expected that if it was taken away, there would be a reaction to that. It could be shrinking, it could be raising capital to supplant it, and so forth. All that was foreseeable. But to say that it was foreseeable that at a certain time period, a market would be less favorable than at some other time period, or that when the Federal Reserve lowers interest rates and that results in a more favorable market, the breacher should be responsible for that when it's seven years out, or even 18 months out. I submit that is not what the law says. The court should be agnostic on market movements wherever it can be. And that's why the emphasis is look at the expectations the date of the breach. Because then you're taking that factor out of the equation. So you want the parties to actually sit there and think about what's the range of possibilities seven years out if Congress changes the rules, and the market does these things, and Europe does this, I can figure it out. But business people don't do that sort of thing, nor do government agencies, do they? When we talk about foreseeability, we really mean things like you can't expect that Mars will attack us. I mean, that's not foreseeable. But changes in the market, all kinds of things, aren't those things foreseeable even if you don't know exactly what they are? And why else are you in business? What Fifth Area is saying was foreseeable was that a delay in converting could result in fewer proceeds. Isn't that foreseeable? It was foreseeable that a reaction to the phase-out of Goodwill would be to raise capital. That was foreseeable. It was foreseeable that that might be costly, depending on the situation. And the courts have said that because that was foreseeable, the breaching party is responsible for those costs. To add on to that additional damages because over an 18-month period or a seven-year period, not due to the breach, but due to exogenous factors, there would have been additional proceeds or there would have been additional deposit premiums is removing the damage from the time of the breach by a substantial period of time. And I mean, from the first case of Pavley versus Baxendale, I mean, you know, That was too many years ago. Yeah, it was a lot of years ago. But the point is that you want to be within what is reasonably ascertainable by the party so they know the downsides of getting into what they're getting into. And to hold the government for general approvals of the economy that half a year after the breach, as Fifth Third would like you to do and as the trial judge did to us, is not consistent with the case. You're suggesting these SNLs travel on subways, but we don't need to go there. Okay. May I ask a question? With regard to this argument on damages, if the sale of the Cincinnati division was not part of the proposed solution here, and if that was something that was not anticipated prior to the breach here, as well as the conversion from mutual to stock, why wouldn't those be part of the foreseeable damages caused by the breach in this case since there was a capital plan in place and that plan did not include either of these provisions that ultimately resulted because of the breach, or so it seems? The downsizing, which is what the sale of the Cincinnati division was, was foreseeable. Whether the damage that the trial judge said resulted from that downsizing was foreseeable is the question we've just been discussing. The trial judge said that in a hypothetical sale, seven years after the actual sale of those branches, those branches would have yielded higher proceeds and that the government can be charged for that change in the economy. We don't deny that. Had Fifth Third presented evidence of actual out-of-pocket loss or actual damage relating to downsizing, they would have been entitled to that. Had they presented actual damages relating to raising capital, and by the way, they did raise capital, and there was evidence in the record of the cost of raising the capital, which they could have asserted as a damage claim and it would have been consistent with all the other cases that relate to mitigation damages, but they didn't do that. They want an award, and they want an award that simply takes the alleged but-for proceeds and subtracts from it the actual proceeds and says that's the amount the thrift was damaged by, and there is simply no case law and no economic testimony in trial that says that or that supports that. In the mitigation cases, home savings, the sale, say, a dollar of capital can be used to earn profit, and the benefit is the profit that the capital is used to earn, and that has to be netted against the cost of that capital. Your argument, in a sense, I suppose, is that there are three possible ways of raising capital, and I'm being a little facetious here, but I think to try to get to the crux of your argument, one is to issue bonds, debt instruments of some sort. A second is to have a stock offering, and a third is to go to Uncle Jones, Uncle Charlie, who has a lot of money and will give it to us, no strings attached, that the second option is much closer to the first than it is to the third. The second option is less than the first.  That's what you talked about. The bondholder is someone who has a right, not necessarily non-defeasible, but nonetheless has a legal right to give his money back plus a fixed amount of interest, but doesn't have any upside. The shareholder has an expectation, perhaps, not one that he has legal entitlement to, but an expectation of getting either the money back or some kind of interest along the way in the form of dividends. But Uncle Charlie has no expectation of getting anything back, so if you deprive the company of the right to go to Uncle Charlie, and Uncle Charlie would have given them the money, they get the whole thing. Your argument is here they get what they would get if they had issued bonds. Yes, and that's, I think, what you said in LaSalle. You said dividends and interest payments, both are a cost. I'm sorry, did you have a question? No, that's fine. I think this would be a good point at which to hear from Mr. Hansreid, and we will reserve your full rebuttal time. Thank you. May it please the Court. Of course. The only issues that really have been addressed in the briefs by the government and in the argument today, causation and foreseeability, are fact issues. There is no legal principle, no legal standard that they say was misstated by the trial court. And the fact issues, notwithstanding the government's comment that there was no evidence, there was substantial evidence. That's not really the test, though, is it? Well, there was ample evidence supporting all of the findings of the trial court. You're saying there was no clear error. Is that what you're saying? Isn't that the test we're worrying about on facts? There was no clear error, certainly, in the trial court's findings. In which case the case is over. That's your argument. Yes, because their arguments are all going to fact issues of foreseeability and causation. So if the trial court adopted the wrong test on damages, that's a question of fact? Their argument is not the wrong test, that it's the wrong test. Their argument is really that the particular damages that were awarded were not foreseeable or not caused by the breach. Those are fact issues. I don't want to interrupt the sequencing that you had intended for your argument, but at some point I would like you to help me out with my little humble example of the dead instrument, the stock, and the gift. This is focused on in the briefs, but some clarification would be helpful to me, at least. Well, let me start. At a low level of economic expertise, because that's where I live. Well, a couple of points on that. One is with respect to the debt. And there was some comment made about the offset, the $22 million debt offering that should be an offset, which is a point that the government expressly told the trial court they were not arguing, they were not advancing. That was in the pretrial order, and that was signed off by the trial judge that the government was not arguing the $22 million offset. Beyond that on the merits, it's completely wrong for a number of reasons, including the fact that the sub-debt does not count towards FIREA capital requirements, and this court held that in the Citizens Federal case earlier this year. So the notion that the $22 million has any role to play in this case is just wrong. With respect to costs of capital, to get back to the hypothetical that your Honor had, our experts in calculating their damage models, in calculating damages, did account for costs. The damage models are not the simplistic here's what you got, here's what you would have gotten, subtract one from the other. It was a much more nuanced, sophisticated model that did take various other components and cost into account. Again, this may be unduly simplistic, and tell me if it is, but this is the rough outline of the way I'm seeing this issue. If upon being presented with a requirement that capital be raised, the bank had decided, okay, we're going to issue bonds, or otherwise finance this through debt. They went out and they got a million dollars of debt. They would have damages, presumably consisting of whatever the cost of obtaining the bonds might be, and perhaps any loss of the opportunity to earn money on the money they would have been able to lend, but for the restrictions that were imposed. Those kinds of things. But they wouldn't be able to just add a million dollars and say there's our damages, we had to borrow a million dollars, it's a million dollars, right? Because they have to pay the million dollars. So the question is how does that apply? If I understand the question correctly, there are cases where you're talking about replacing goodwill. And the goodwill has no intrinsic value in itself. The value of the goodwill is only what investments or profit one can obtain from it. And so in those cases it's certainly appropriate, and the courts have held, that the damage looks to that increment. Here we're talking about cash. We're not talking about that non-tangible component. What we lost is the trial court plan. What we lost was the ability to convert at the time that our original plans would have had a conversion happen. And we were forced to sell the Cincinnati division. And those are the damages that we're seeking. Those actual events and damages also based on actual events. Right, and the question is with respect not to Cincinnati but to conversion, the question is how to calculate the quantum. And I guess the question is you, again maybe this is not entirely fair characterization, but your approach seems to be that the way you calculate it is you decide how much more you would have been able to obtain with a conversion at the time of your choosing as opposed to what you were forced to do. And their argument is, well, no, that can't be right because this is more like a debt, more like you were having gone into the bond market. And you wouldn't get to count the amount. No, we were not in the bond market. True, of course. The notion that the government advances and their experts advance that the proceeds constitute a liability is nonsense. It's preposterous. The proceeds come with no obligation to repay the investors. I mean if the government's theory were correct that every initial public offering and the proceeds from an initial public offering constitute liability, then every company that has an initial public offering would be insolvent on the day that that happens. As an accounting matter, the government is completely wrong. And a number of their arguments, including multiple of the points that were just recited in the oral argument, stem from the notion that the proceeds from the stock conversion constitute some obligation, liability, or debt to repay the investors. At least I think the way they put it is an expectation on the part of the investors to receive a stream of dividends. Well, the prospectus said that it was clear that there was no guarantee of dividends and there were no dividends contemplated. So while every investor may have an expectation of return on investment or stream of income, it doesn't create an obligation on the part of the issuing company to fulfill that other than an actual debt instrument or a formal promise of payment of dividends you might have. Well, I've interrupted the stream of your argument, so why don't you... I'm satisfied that you responded. Well, I guess I was talking about the government experts and a useful point for me to transition a bit and say I've imagined how this case would proceed if we had the equivalent of the government experts, namely an expert who had a fundamental disagreement with all of the appraisals done by the agency for the last 20 years and an expert who was not familiar with reading audited financial statements. The government's position would be that what we had proposed was preposterous, that the notion that the proceeds from the stock conversion constitute debt, constitute liability, or akin to a loan from the investors would be laughable. And in contrast, what we had was an expert in his appraisal and in his damage analysis who utilized precisely the appraisal methodology that the government agency requires. Now, had that been opposite, it's quite clear, it's equally clear in this context. The judge at the trial was entirely correct in crediting the testimony of our expert and notwithstanding the government's comment that there was no evidence, there was. Dr. Brumbaugh in particular testified precisely to the points at which the government says there's no evidence. I think in many respects the government's argument kind of gets off track in their briefs. Right at the beginning, when you look at the statement of facts, and remember this is a case that's coming up after trial in which the government essentially, although it's sort of camouflaged, but essentially the government is arguing insufficiency of evidence. And the statement of facts in the government's brief makes no reference, no mention, and no citation to any of our witnesses. But fortunately for us, the trial judge heard those witnesses and she credited those witnesses and in a careful opinion explained precisely why their view was more in conformity with reality than with prior case law. So, on that. The damage model, for both aspects of the damages, follow the conventional expectancy damage model. Namely, to put the injured party in the position it would be in had there not been a breach. The court found that had there not been a breach, we would have converted in August of 93 to stock ownership and would have held on to the Cincinnati division until the subsequent merger into the Fifth Third Bank in 1998. As to both, both of those findings are certainly not clearly erroneous. One, in particular, especially given the government's arguments on causation, we refer to the trial court's opinion in the appendix at page 214, I guess it's 000214, where the court quotes from the OTS November 91 regulatory plan that says that the Cincinnati branches were sold, quote, due to the capital requirements imposed by FIREA. Now, for the government to argue, 16 years later, that the people on the spot at the time knew exactly what caused that event, is certainly in no position to say there's no evidence to support us on causation. The damages model are also quite reality-based. The conversion in 93 and the date that was taken of 93, and really all the components of how much of Cincinnati gets weighed back in and so forth, those are essentially unchallenged on the appeal. And the date is not challenged on the appeal. It's also the first date consistent with the business plan and contemporaneous advice that the bank had, the first date on which the bank would have converted, the advice that the bank had gotten back in the mid-'80s, which was to consider converting in an up market following two to three years of positive earnings. We selected, for the purposes of capital and damages, the first date. Any date thereafter would have resulted in higher damages because the market continued to go up. We took the most conservative date, and one that's not just a litigation construct, but one that comes directly out of the business plans and consulting plans and advice the bank had received going back to the 80s as to the timing of an appropriate conversion. So again, it's a reality-based damage model. The same with respect to the Cincinnati damages for 98. What we're looking at is an actual sale in 91, an actual sale in 98, and the premium deposit that was used as the basis was one that was consistent with our entire business practice. As the trial court found, it was a reasonable number. It was below the national average. And remember, of course, that the trial judge was confronted with government positions, which is reflected in her opinion, in which she said that part of the problem was the government taking extreme positions left her with all or nothing options. The various midpoints that the government is arguing on appeal were not positions that they presented to the trial court. But for example, the government put in a suggestion as to what deposit premium to use for Cincinnati that was lower than the deposit premium than the bank actually got in 91 when it sold the Cincinnati branches. And notwithstanding the fact that seven years later, the market had changed, the market was better, you didn't have all of the other activity. Remember, when we sold Cincinnati branches in 91, we had a conversion at the time that they had. Those were forced sales. Forced sales in bad markets. Bad markets not simply because of economic conditions, but bad markets because there were so many other thrifts that had been thrust into the same disastrous situation by the government's breach. And that was exactly the market. And to go back to the hypothetical you used about the bank coming in and forcing you to sell your house, I think to get one that's even a little bit closer to the circumstances of this case would be the bank coming in and putting a wrecking ball through your roof, a bulldozer through your side wall, doing that to lots of other houses in your neighborhood, and then demanding that the house be sold immediately. I was trying to stay out of the world of torts. Stay with contracts. Well, but the damage model of the contract is still the same. With respect, if I have just one more... Well, but the damages would be different between the two. I mean, the way one would approach damage is because of the difference in tort and contract damages, which is why we've got a problem. I mean, there is some kind of problem here in inquiry at the level of degree of foreseeability. Well, yes, but when you have somebody who does have in place a plan to, as you mentioned in your hypothetical, a plan to be selling the house, if not on a specific date, at least you had circumstances that you described would be the appropriate times for selling the house, it's quite different and certainly not a speculative notion that you'd be selling the house under the circumstances that you contemplated selling the house. With respect to our cross-appeal, if I can just get 10 seconds in on that, the judge made the findings of fact that allow this court to enter the judgment for the amounts indicated in our brief, and you can see that, as you have, the trial court opinion is quite specific in saying I'm going through the calculations in the event the court of appeals disagrees on the legal principle and on the one factual point that we raised, namely the... May I ask a question? Sure. One question. When I read the gray brief, I was uncertain. Is your argument that she applied a different standard test of proof for the lost profits from 92 through 98 than she did when she calculated the other damages? Well, she said reasonable certainty for all of them. As to the ones that she awarded, I think it simply means that she held us to a higher standard and we met it. You're just happy you met that standard, but you're complaining that when she applied that same standard and she did it with one... That's correct. And with one misapprehension of the facts, namely that the Cincinnati assets were not separately invested. They were pooled with everything else, and when you recognize that it's pooled, you realize that we did provide the alternate... not the alternate, but the investment opportunities that were presented. Thank you. Thank you, Mr. Gentry. Mr. Levitt, we'll restore your time, which I think is five minutes, if you need it. Mr. Levitt, maybe you could help me right at the outset of your rebuttal. I'm having trouble getting my arms around your case to this extent. I'm sure you're aware of the cliche that we are a court of errors. We don't commit them. We try to correct them, and I'm trying to figure out exactly what is the error that you're trying to get us to correct in this sense. This case started back, what, 1995, some 12 years ago. The trial judge picked it up in 2002, and in the course of time, she has written seven... I guess she's had seven opinions to write, and when we finish with this one, it will be the ninth in the history, two for us, seven for her. We have before us a 45-page opinion from the trial judge thoroughly reviewing the entire history of this particular set of cases. We have in our database an enormous back record of decisions on the law of these cases and the standards for damages and so on. You raised the foreseeability question. The trial judge, 220A220, begins a section called Testimony Regarding Foreseeability and goes into all of that. She clearly was aware of Hadley v. Baxendale. We don't have to tell her about that. And I'm wondering if Mr. Gansfried isn't really correct that what you want us to do is redo the factual determinations that the trial judge made, and if so, can you point to at least one big factual determination that is clearly erroneous? Clearly erroneous. It's not what we wanted. It's not what you wanted. It's not what we wanted. Help me understand why you're here. You'll remember Glendale, where the first position was that the amount of the excess liabilities was a measure of restitution damages or restitutes. And you said as a matter of law, that's the wrong way to look at it. It's not clear error, in fact. We're saying reduced proceeds, it's like excess liabilities. As a matter of law, it doesn't make sense that reduced proceeds, meaning the lesser amount subtracted from the higher amount, is damage. There's no economic basis. There isn't harm by virtue of a dollar for dollar through lessening proceeds. There could be harm if netting the use of the proceeds against the cost of the proceeds would have been a positive number, and it could have been. But just to say, for the reasons Judge Bryson sort of went at in his question, that this arithmetic calculation is a damage. It's simply inconsistent with all the case law in Winstar cases. And it's a question of law. It's not parsing what each witness said at trial and trying to identify clear error or what the charge has said is inconsistent with the evidence. It's saying that she had a misconception of the way to go about quantifying damage, just like Judge Smith and Glendale, having done the best efforts, had a misconception in this court's view of how to account for restitution damages because excess liabilities doesn't, as a matter of law, qualify. In my mind, it's a very sane kind of analysis. Is it logical that reduced proceeds, meaning the subtraction of the lower amount, is the damage? And it isn't. Now, when counsel tries to say there's a difference between debt and stock issuance, that is also inconsistent with this court's precedent. Because if you look at LaSalle Talman, it's as clear as day that you said it doesn't matter if it's a legal obligation from a bond or that the expectation of the investor is that he'll receive dividends. Those are both costs of capital. He expects that money back, returns on that money. If that's the case, the increment cannot be the damage. There's got to be a different way to look at the damage. If we disagree with you on that, the case is over, right? If you disagree with that and you disagree with the position that intervening market changes, then you should be agnostic on that, that it's got to be the day of the breach, that's the day under BIRB, that you determine the damage. If you disagree on those two things, my case is infinitely less strong than I think it is now. Does infinitely less strong mean over? You still have some arguments. Yeah. That's the core. I have other arguments, but... You always have, but the government always has other arguments. I'm not quibbling to try to make little distinctions from other Wingstars. I'm saying there's something fundamentally wrong here. That's what I'm trying to grasp is the fundamental error that you'd like us to correct. That a dollar capital is a dollar loss without thinking about it some more, or having evidence that supports that. And I say that's inconsistent with all the case law in Wingstar cases. And it was incorrect for the trial judge to adopt a methodology that did just that. On the causation point relating to... You asked about clear... So just to make sure that I understand exactly what you... You would say that it's perfectly okay... Again, taking the parallel between debt and equity. If the breach meant that you were incapable of raising an extra million dollars in debt instruments, you just went out in the market, and two things happened. One, it cost you more to raise the money, and two, you couldn't raise as much. Then you would get the profits you would have made on the amount of the bonds that you would have sold in the but-for universe, and you would get the incremental cost for selling what bonds you were able to sell. Those two things, but not the actual corpus of the unsold bonds. And you'd say the same thing applies in... Yes, and there was no proof of the former because they rested only on this corpus of the capital. That was their case at trial. They didn't provide proof of what you talked about on the first alternative. The only proof they had was they would have raised X dollars in one year, they raised Y dollars, but the difference is damage. That's all they said at trial, not the analysis that is subsumed by your second example. There is one clear error. I've said it's a methodological mistake that she made. It was a breach of discretion because she misconstrued what a valid damage quantification analysis is, but there was one clear error that I want to point to. The clear error was that the trial judge ruled that there was pressure by the regulators to convert early to sell Cincinnati, and she said that, and it was uncontested at trial. The only evidence at trial about it were the regulators who testified that. They asserted that pressure, not because of goodwill not being there, because goodwill could not affect the on-the-ground conduct of the institution at that point. They were making no profits. They needed to revise the balance sheet. They needed real capital in order to bring about earnings and rectify losses that had occurred since 1988, and the regulators said at trial, and it was undisputed by Fifth Third, that counting the goodwill, we would have come out no differently. We had to do what we did to advance safe and sound banking, goodwill or no goodwill. There was clear error for the judge to say that testimony didn't matter, because even if that testimony was true, that breached the contract. Even though they counted the goodwill, or they would have counted the goodwill, or the advent of the goodwill would have made no difference, that would have breached the contract.  what that's saying is that that contract that was formed in 1985, in effect, should be construed as tying the hands of the regulator to conduct regulation that results in safe and sound banking if there's the slightest inference that doing that could somehow devalue the goodwill. There is no case that says that, and it's inconsistent with any reasonable interpretation of sound policy. Thank you, Your Honor. Let me ask you, if I could, one factual question. Mr. Gansfried refers on the cross-appeal to the point he characterized, the misapprehension of fact with respect to the pooled assets. Do you agree that the trial judge had a misapprehension as to the state of the evidence with respect to that issue? No, I think the trial judge properly noted that in order to prove a lost profit, there needs, under the case law, there needs to be the presentation of a business plan saying what the thrift had planned to do, what investments it had planned to make, and what financing it planned to use in order to make those investments, and that the evidence shows what those investments would have earned and how much cost there would have been to that financing, and that's under CalFed and Glendale. That's not what happened in this case. What happened in this case was that Fifth Third said that the return on assets of the actual bank was X. If the actual bank had expanded exponentially to bring back Cincinnati, the return on those assets would have been the same, not because it described what those assets would have been or what the financing for those assets would have been or had any evidence following or monitoring those assets, but simply because of an arithmetic calculation, and our position is that the trial judge, in rejecting that, was acting fully consistently with all the case law. There's only one case that I know of that's awarded lost profits, and that's this Globe case. If you look at this Globe decision, the kind of evidence I've just described was in the record in that case very fulsomely, and the trial judge who wrote a very good opinion that was affirmed by this court in a short per curia simply pointed out that all that evidence was there. None of that evidence was presented by Fifth Third in this case, so she didn't confuse anything about pooled assets. Even if all the assets are pooled, the additions to the pool that resulted from the Cincinnati deposits would have been different assets and less valuable assets, presumably, probably because they would have been marginal rather than average assets. I think you've covered the question. Thanks very much. Now, Mr. Gansreed, since this pertains to the cross-appeal and since there was a brief argument on this, you have the last word briefly. Thank you. But only on the cross-appeal. Yes, very briefly. First, I guess the answer to the point that there's no evidence on the points that he describes is that there was a lot of evidence, and that's what we put on at trial, and that's what the judge discussed in the opinion. I think the government is, again, simply looking at its own evidence as the only evidence presented in the case. As to the point about adding back Cincinnati, you said the bank expanded exponentially by bringing back Cincinnati. Cincinnati was brought back in a very conservative way with exactly the same appraised value that had been used for the earlier calculations, going back to 93, going back to 92, going back to 91. Numbers as to which there is ample, abundant, overwhelming evidence in the records. Thank you. We thank both counsel, and the case is submitted. We'll hear argument next in number...